UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL

UNITED STATES OF AMERICA, Plaintiff,

vs.

MICHAEL MARTIN, Defendants.

1:18-cr-035 LJO-SKO

SENTENCE

Fresno, California — Monday, December 17, 2018

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES OF COUNSEL**:

For the Government: **BRIAN DELANEY**
Assistant U.S. Attorney
2500 Tulare Street, Rm. 4401
Fresno, California 93721

For the Defendant: CARRIE C. MCCREARY
Attorney At Law
7081 N. Marks Avenue, Ste. 104
Fresno, CA 93711
BY: **CARRIE C. MCCREARY**

REPORTED BY: PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

Monday, December 17, 2018 Fresno, California
10:21 a.m.

THE COURT: Let's call the case of United States versus Martin, number 12 on calendar.

MS. MCCREARY: Good morning, your Honor. Caroline McCreary representing Mr. Martin. He is present, in custody.

MR. DELANEY: Good morning, your Honor. Brian Delaney on behalf of the United States.

THE COURT: All right. What is your name, sir, please.

THE DEFENDANT: Michael Martin.

THE COURT: Have you had a chance to review the Presentence Report with your attorney?

THE DEFENDANT: Yes, I have.

THE COURT: Do you have any questions that remain?

THE DEFENDANT: Just, I mean, you know, not really. My lawyer answered the questions that I needed answered.

THE COURT: Okay. The Court has received and reviewed the Presentence Report; the defendant's objections; the letters from his grandmother, sister, cousin, aunt, and uncle; the defendant's memorandum; also, the government's memorandum.

The Court finds that the offense level is 28. History Category is VI. Guideline range is 140 to 175.

Although the recommendation by Probation is at the

higher end of the guideline range of 210, it is because of the change in the applicable offense level that the number does not correspond.

Am I correct in asking Probation, am I correct that had the aggravated assault issue been determined, as I have just determined it and as agreed by both sides, that the probation recommendation would be 175?

PROBATION OFFICER: Yes, your Honor. Anthony Andrews on behalf of Probation. Yes, your Honor.

THE COURT: All right. The Court has considered the extensive record, which is -- "extensive," is an understatement. Also, the other 3553(a) factors, including two failures to appear.

Do you wish to be heard further, Ms. McCreary?

MS. MCCREARY: I do, your Honor. I was, first and foremost, I was hoping that the Court would consider a guideline departure or a variance commensurate with my client's two-second involvement in this offense.

It is my position, and the position of many others involved in this case, that there was no extensive planning going on in this case.

THE COURT: I -- that objection is overruled. There was extensive planning going on in this case.

MS. MCCREARY: And I also argue that the enhancements for more than minimal planning would not apply, considering

the video of my client being positioned on a table that was not the same table that the government suggests is part and parcel of the planning in the video.

I also implore the Court to consider that my client's criminal history, as elucidated in the PSR, is an overrepresentation of the seriousness of Mr. Martin's criminal history.

Specifically, his criminal history includes several points for minor offenses, and to that, though, the government argues several Tribal Court convictions were not counted; however, those convictions were minor offenses as well and would not ordinarily be counted.

THE COURT: Well, what I'm seeing are the following: Unlawful imprisonment, resisting, theft, consumption of alcohol by a minor, concealed weapon, battery, two more alcohol offenses, DUI and reckless, another assault, another theft, another assault, another theft, trespass, disturbing the peace, another assault, theft, possession of stolen property, battery, two more batteries, Vehicle Code violation and a felon with a gun.

I doubt very much that the victims of the batteries would think that they were particularly minor. I'm not seeing this as a minor type of criminal history. As a matter of fact, it appears to me to be violent and continual.

MS. MCCREARY: All of those cases were centered

around alcohol abuse, and he was extremely young during that time period.

THE COURT: Well, it's actually been going on since he was 13, and the last numerous ones were when he was 23, 26, 27, twice. He has been active, and he is only 30. Doesn't look good.

Is there anything he wants to tell me?

THE DEFENDANT: Yes, your Honor. I got a family that loves and cares for me, and I love and care for them too as well.

THE COURT: Why aren't you acting like it? Every time you commit a crime, you hurt them.

THE DEFENDANT: I understand that, and I take full responsibilities for my actions. And I just want to say I'm sorry to you, to the victim, to -- this is my first time in prison.

And like I'm not going to try and make excuses for my actions, but it was like the best way I could explain it is like I was a boat in a storm, right. I see all these waves coming, and I can't really do nothing about it except just go with it, you know what I mean?

And like I said, this is my first time in prison. And I'm just trying to, you know, just trying to survive, pretty much.

And I apologize for my actions and -- but at the same

time, you know what I mean, it takes two to tango. You know what I mean?

THE COURT: And you think the correctional officer was also tangoing with you?

THE DEFENDANT: Well, I mean it is bigger than that. You know. It came from so many different things. And like I said, I'm not trying to make excuses for what I did, but --

THE COURT: That's exactly what you are doing.

MS. MCCREARY: Are you talking about the other people that -- the other people in this case?

I think he is explaining that he felt that the -- if you view the video the way I viewed the video, based on what my client explained to me, is that this fight spilled out right into a hallway that he normally traverses on a daily basis. And he was just going --

THE COURT: It spilled out because the correctional officer was running for his life.

MS. MCCREARY: Exactly, exactly.

THE DEFENDANT: Your Honor, I signed a plea offer, and the prosecutor said that, by his estimation, it was 77 to 96 months, and that he would go for the low end. And that's what I signed.

And I just found out just recently that Probation came with 168 to 210. And I mean I would have never signed for that if I knew it was going to be that. You know what I

mean?

THE COURT: Well, it isn't that.

THE DEFENDANT: But it is not what I signed for either, though.

THE COURT: There was no guarantee. As a matter of fact, when I took your change of plea, I told you specifically that the Court is not bound by any plea agreement, didn't I?

THE DEFENDANT: Yeah, you did, you did, your Honor. But I was just -- I mean from my past experiences, you know what I mean, like, usually your Honor would respect the prosecutor's -- you know, his word, pretty much.

THE COURT: As I understand his word, his word is that he would recommend the low end of the guideline range that pertained to your case. He didn't commit to a specific number.

THE DEFENDANT: But he, in a memo my lawyer showed me, he said --

MS. MCCREARY: He is still doing that. He is still recommending the low range. So --

THE DEFENDANT: It is not 77 to 96, though. But that's what he put on there, on the memo, from his best --

MS. MCCREARY: Estimate.

THE DEFENDANT: -- estimate, it was 77 to 96.

MS. MCCREARY: Okay.

THE DEFENDANT: And I kind of got pushed into this

without really having time to think about it because he told me if I didn't take this offer that he was going to supersede a new indictment.

MS. MCCREARY: Okay. You are better off --

THE COURT: Well, that's not up to me. That's a prosecutor's decision. And that's one of the reasons I told you that I'm not part of the plea agreement; if I don't follow the plea agreement, you cannot take your change of plea back. That's exactly what I told you at the change of plea.

Is there anything else you want to tell me?

THE DEFENDANT: Like I said, man, I just, I take responsibility for my part, you know what I mean. But, yeah. Thank you.

THE COURT: Okay. Does the government wish to be heard?

MR. DELANEY: Your Honor, I would like to correct the record on a few matters, your Honor.

First of all, I understand the gravamen of defense counsel's case is that this defendant played a very minor role in this whole scheme of things and that his actions on that day were very small and, because of that, this sentence or potential sentence here in the guideline range overcompensates for his small role in this.

The facts belie this argument, your Honor. At every critical stage of this case, this defendant was involved. It

began on October 5th, in that morning, when he was with Mr. Chiago, the principal of this whole thing, when he was stopped by the victim in this case, Correctional Officer K.

So he is there at that point. And then defense counsel indicates to the Court that he wasn't present at the later meeting, which the Court is aware of, that meeting in the library.

Well, he was there, your Honor. And I have marked as Government's Exhibit 1, if I can approach the bench? And this was provided to counsel, your Honor.

If you look at that long table where everybody is surrounding, you will see in the middle -- it is hard to read those names. You might need a magnifying glass; I almost do now. But Chiago is bent over. He is talking to everybody. Everyone is listening.

And if you look at the far end of that table, there is a person bent over, with a hat on. I might add that's the same kind of beanie he was wearing the next day when the assault occurred. That has been identified as Michael Martin, your Honor. He was present there. Every one of the six defendants that were involved in that were present that afternoon.

Then the next morning -- and you have had an opportunity to review that video as well as defense counsel and prosecutors.

THE COURT: Many times.

MR. DELANEY: And you recall, they congregate together. The six of them are inside that same room where you have just seen the picture. They are there. Down the hall go Chiago and Mota. And looking through those two windows that were in this picture, they watch them go. And as soon as they get to the door, they all get up together. They put their hats on, like they are going to work, and they station themselves outside of door.

Mr. Chiago was one of the first ones, one of the first two out that door to go out there. It was because that he was the first of the two that he kind of overshot the door a little bit to make room for the others, the other three individuals.

And when -- when Officer K comes out, he is behind them. And because he is in that position, he is one of the last to get into the assault, your Honor.

But his role, clearly, was to block anyone from going into that room or anyone coming out of that room. They failed at that goal, but that didn't stop him from running down the hallway, and when the opportunity availed itself to him, a defenseless K is on the ground, and he jumps on him and starts pummeling him, your Honor.

He knew the other defendants had those blades in their hand. He clearly would have seen that looking in that

doorway. Clearly would have known that from the circumstantial evidence. And that's the case, your Honor.

As to his criminal history, I think the Court has that totally correct, but I would add a number of other things.

One is that he didn't get scored for all of those Tribal cases. I think there were six of them. I could give you the paragraphs, but I know you've already reviewed it, but of those one, two, three, four, five, six, seven Tribal cases, none of them were scored. And of the seven, three of them were assaults and batteries.

Then one can also look at the fact that the current case that he was in Atwater for, that case, when he was charged with that case, you saw it was like four -- three different incidents where he is with a gun, he gets caught with a gun, they let him go, he gets caught with a gun, they let him go. Finally, he gets caught a third time with a gun. Each time, he fights off the officers or he flees and eludes.

So he is clearly a danger to the community and the police officers.

When he finally gets charged by the federal government, the state government dismisses a case, their case of a felonious assault case with a drive-by shooting, with intent to cause serious bodily injury.

Clearly, this defendant poses a serious risk to the

community and to law enforcement, as shown by his activity within prison, your Honor.

And then finally, the United States did have plea discussions with counsel in this matter. And counsel didn't bring it up, the defendant did, but a couple of things.

We gave our best faith estimate of what the guidelines might be at that time. Before fully investing ourselves in the case, I misidentified what I thought the criminal history might be. It was VI. I told him IV, which has a huge variance on what the outcome would be.

And I also said in the last sentence of that was, "Of course, these are estimates, and subject to argument before the Court."

It is not my job to make that determination. The plea agreement makes that clear, that whatever discussions we had before don't count as the plea agreement, and that whatever the Court finds is what the law is and what the guidelines will be.

Having said all that, we stand by our plea agreement. We still recommend the low end of the Guideline range of 140 to, I believe, it is 175, your Honor. Thank you.

THE COURT: Anything further?

MS. MCCREARY: Just briefly. The fact that I'm indicating that my client, and he is indicating that he had to just go with it, I think that the fact that he only, at the

time that this occurred, he only had seven months left to be incarcerated when this happened.

And the fact that he is over to the side, outside of the direct earshot of this plan, and he is -- the -- he was positioned in the back, in a place where he normally would be, that is my argument.

It is just a mitigating argument. It is not to say that anything that happened was excusable at all. It is just a simple mitigating argument. And I submit on that.

THE COURT: This was a vicious attack. This was a planned attack. And you are right in the middle of it, Mr. Martin.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that you are committed to the custody of the Bureau of Prisons, to be imprisoned for a term of 150 months.

You shall pay a special assessment of a hundred dollars, payment to begin immediately, and the Court does find you do not have the ability to pay a fine. That's waived.

Upon release from imprisonment, you shall be placed on supervised release for a term of 36 months. Within 72 hours of release from the custody of the Bureau of Prisons, you shall report in person to Probation in the District in which you are released.

The Court does overrule the objections other than the

objection on the aggravated assault. That one is sustained. The others are overruled.

And the Court incorporates by reference the Document Number 125, from line -- page 3, line 17, to page 6, line 15.

While on supervised release, you shall not commit another federal, state, or local crime, and shall not illegally possess controlled substances.

You shall cooperate in the collection of DNA, as directed by Probation; shall comply with the standard conditions recommended by the Sentencing Commission and adopted by the Court; shall refrain from any unlawful use of a controlled substance; shall submit to one drug test within 15 days of release from imprisonment and at least two thereafter, not to exceed four per month.

The Court is going to order the seven special conditions, which I can read or incorporate by reference.

MR. DELANEY: Incorporate.

MS. MCCREARY: Incorporate.

THE COURT: With regard to location, what is your request, geography?

MS. MCCREARY: Oregon, Washington?

THE DEFENDANT: Anywhere as close to home.

THE COURT: Where is home?

THE DEFENDANT: Washington.

THE COURT: You are in the state of Washington?

THE DEFENDANT: Yes.

THE COURT: Court will make that recommendation as it accords with security classification and space availability.

There are remaining counts?

MR. DELANEY: Yes, your Honor. The government would move to dismiss the defendant -- well, actually, yeah. We would dismiss him from the remaining counts of the indictment.

Could I make a couple other comments, your Honor?

THE COURT: Yes, that request is granted. Appellate rights have been waived.

Yes?

MR. DELANEY: With regards to the aggravation, your Honor, I believe the adjustment was from 2A2.2(b)(3)(A) or where the initial guidelines was five points for serious bodily harm, and we argued and we set forth in the plea agreement that his conduct would have resulted in just bodily harm, your Honor.

THE COURT: Agreed.

MR. DELANEY: That would be the two levels. And the other thing is we would ask the Court sentence that his sentence be consecutive with any unfinished term.

THE COURT: Absolutely, it is consecutive. This was a completely separate crime from anything he was serving, and this is exactly the type of crime where the sentencing should indicate what should not happen in a custody setting, and

certainly did happen here.

Anything else?

MR. DELANEY: No, your Honor, thank you.

MS. MCCREARY: No.

THE COURT: That's the order.

(The proceedings were concluded at 10:32 a.m.)

I, PEGGY J. CRAWFORD, Official Reporter, do hereby certify the foregoing transcript as true and correct.

Dated: 21st of February, 2019 /s/ Peggy J. Crawford
PEGGY J. CRAWFORD, RDR-CRR